# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 8059 | **DATE** | 9/28/2001 |
| **CASE TITLE** | Sungard Business Systems, Inc. vs. Mercantile Trust Company | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Plaintiff's motion for summary judgment [32-1] is denied. Defendant's motion for summary judgment [18-1] is denied. Status hearing is set for 10/22/01 at 9:30 a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | 3 | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | SEP 28 2001 | |
| | Notified counsel by telephone. | | date docketed | 53 |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | FILED FOR DOCKETING | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 01 SEP 28 PM 3:25 | | |
| MD | courtroom deputy's initials | | 9/28/2001 date mailed notice | |
| | | Date/time received in central Clerk's Office | MD mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

SUNGARD BUSINESS SYSTEMS, INC. )
d/b/a SUNGARD ASSET MANAGEMENT )
SYSTEMS, )
)
)
Plaintiff, )
) 99 C 8059
)
v. )
)
MERCANTILE TRUST COMPANY, N.A., )
)
Defendant. )

## MEMORANDUM OPINION AND ORDER

DOCKETED
SEP 28 2001

Plaintiff SunGard Business Systems, Inc. ("SunGard") filed suit against Mercantile Trust Company ("Mercantile") for breach of contract (count I), quantum meriut (count II), conversion (count III), and under the Illinois Trade Secrets Act (count IV), based on the alleged failure of Mercantile to satisfy the terms of a contract for computer software and services entered into between the parties. SunGard is a Delaware corporation with its principal place of business located in Alabama. Mercantile is a national banking association located in Missouri. Neither party contests that the amount in controversy exceeds $75,000. The court, therefore, possesses diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332. Mercantile has moved for summary judgment on all counts, and Sungard has moved for summary judgment on count I. For the reasons articulated below, the court denies both motions.

## SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.

56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). In response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-599. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the non-moving party as well as view all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## FACTS

On April 9, 1993, SunGard's and Mercantile's predecessors entered into a software licensing agreement and an accompanying addendum. The original parties to the licensing agreement were National Computer Systems, Inc. ("NCS") and First Bank of Springfield and its subsidiaries, including FFG Trust, Inc. ("FFG").[1] The software provided was used to manage trust account information. Paragraph eight of the licensing agreement states, in pertinent part, as follows:

---

[1] Since entering into the agreement, SunGard acquired NCS and First Bank of Springfield merged with Mercantile.

> This Agreement may be terminated by either party upon written notice not less than ninety (90) days prior to the expiration of the Software License Term or its extensions as described in Article 1.[2] If written notice is not given by either party, this Agreement shall remain in full force and effect upon all terms and conditions then in force and at current list prices for subsequent one (1) year periods. . . .
>
> Upon termination for any reason by either party, and within ten (10) days of such termination, all copies of the Software and documentation shall be returned to NCS by Customer without delay at Customer's sole cost and expense by delivering all such items to NCS' place of business, complete and in good order and condition. In the event Customer fails to return the above-referred items, NCS may enter the premises of Customer, or such place where the items are located, remove and ship the items to NCS' place of business at Customer's sole cost and expense.

(Mercantile Ex. A.) Paragraph eleven states, however, that the agreement "shall not be deemed or construed to be modified, amended, rescinded, cancelled [sic], or waived in whole or in part, except by written amendment by the parties hereto." (Id.) In addition, the agreement's addendum states that it may "contain provisions which may be at variance to provisions in the Agreements. Where such variance occurs, the provisions in this Addendum shall be controlling,"[3] and paragraph four of the addendum states that the following language is added to the agreement:

> The term of this Software License Agreement for Software support is one (1) years [sic] and shall commence on the date Customer is given written notice by NCS stating that the Software is installed and ready for use. thereafter [sic] the term shall renew for subsequent one (1) year periods until terminated by either party upon not less than one hundred twenty (120) days notice prior to the expiration of the initial term or subsequent renewal term.

(Id.) In addition, paragraph nine of the addendum states that "NCS agrees to maintain and

---

[2]The schedules attached to the agreement state the term of the agreement as "perpetual." (Id.)

[3]The addendum refers to "Agreements" because, apparently, the contracting parties also entered into a purchase agreement and a maintenance agreement, neither of which the parties provided to the court for consideration or appear to be at issue here.

3

support the system for a full five (5) year period commencing with the acceptance date of these Agreements." (*Id.*) The parties treated April 30, 1993 as the date when the agreement commenced and May 1 of each year as the date when a new one-year term would begin under the agreement.

In April, 1998, FFG, through either its Data Processing Officer, Edward Ely, or Mercantile's Vice President of Trust Operations Administration, Pat Cook, or both, informed SunGard's Account Manager Joyce Buckley that Mercantile was acquiring FFG and that the merger would be consummated by October 31, 1998. Ely, Cook, or both also advised Buckley that Mercantile, a much larger bank than FFG, did not use SunGard software, that all of FFG's information needed to be transferred to Mercantile's system, that FFG needed information about SunGard's deconversion programs, and that the deconversion[4] (which can be a potentially lengthy process and extend over several contract terms) was to be completed by October 31, 1998.[5] Moreover, Ely, with the understanding that the contract had already automatically renewed and would remain in place until April 30, 1999, asked Buckley if SunGard would consider a month-to-month arrangement. Buckley refused Ely's month-to-month offer.

The parties dispute whether Ely specifically informed Buckley that the agreement would finally terminate on April 30, 1999, and whether Buckley confirmed that she understood that FFG was notifying SunGard of its intent to terminate the agreement effective April 30, 1999, but

---

[4]Deconversion from SunGard's software involved taking information from the software, transferring it to deconversion tapes, and then downloading it onto Mercantile's software system.

[5]Although SunGard disputes that Ely informed Buckley of the October 31, 1998 conversion completion date based on SunGard's interpretation of Ely's deposition testimony, the relevant testimony only supports the proposition that Ely could not recall Buckley's "exact words" on the issue or the "exact words" he used, not that Ely failed to inform Buckley of the deconversion date. (*See* SunGard Ex. D at 60-61.)

4

agree that in April, 1998, Buckley advised Ely that FFG should contact SunGard's Contracts Manager, Clare Gillis, and request deconversion software. Ely attested, however, that Buckley told Ely to request the deconversion software to facilitate the termination notice and that Ely should provide Gillis with the merger consummation date. Buckley, on the other hand, attested that she "never, in any conversation [she] had with Mr. Ely or anyone from FFG, confirmed that [she] understood that FFG was notifying SunGard of its intent to terminate the agreement effective April 30, 1999," "no such agreement was even discussed in any conversation [she] had with him or with anyone else from FFG," and that "the term 'termination' was never used in any conversation [she] had with anyone from FFG." (SunGard Ex. C ¶ 7.) While Ely admitted at his deposition that he could not recall the specific words Buckley used, he explained that Buckley "indicated in her responses that she understood [FFG/Mercantile] would be leaving the system and no longer using it." (Mercantile Ex. D at 63.) Mercantile avers and SunGard denies, therefore, that the parties understood that the agreement would terminate on April 30, 1999. Ely also testified that SunGard did not inform Ely that only written termination of the agreement would be effective or that, as a condition of termination, Mercantile had to return SunGard's software.

On April 3, 1998, Ely sent FFG's President and Chief Executive Officer, James Davis, an e-mail stating that Ely had spoken to Buckley about conversion costs and that Buckley had stated that SunGard "would need a letter [sent to Gillis] stating that [FFG] would be merging with Mercantile and the approximate date that [FFG] would be doing the conversion from the SunGard System." (Mercantile Ex. C Ex. A.) On April 8, 1998, Davis sent a letter to Gillis stating that, as she was probably aware, FFG was to merge with Mercantile and that FFG

5

expected "the trust systems conversion to be completed in October 1998." (*Id.* Ex. C Ex. B.) Davis then requested the cost of converting certain items and SunGard's conversion request form, which he understood might exist. The letter's final paragraph states, "We have enjoyed our association with NCS/SunGard. We would appreciate a prompt reply to these items so that we may begin this process the first week of May." (*Id.*) On April 14, 1998, Gillis sent an intra-company e-mail to three other SunGard employees stating that FFG was converting off the SunGard system and wanted to be completely deconverted by the end of October, and on April 22, 1998, Buckley sent Davis a letter providing the requested deconversion pricing information. The letter also stated that "[u]pon completion of the deconversion, Customer agrees, per the terms of the Software License Agreement, to return all copies of the software, including Deconversion Utilities and documentation, to SunGard (or provide written certification, at SunGard's request, that all copies were destroyed)." (*Id.* Ex. C Ex. C.) FFG agreed to purchase $100,000 worth of deconversion software on April 24, 1998, and timely paid the purchase price sometime thereafter.

Davis swore in an affidavit that based on his communication with Ely and his correspondence with Gillis, he understood that the agreement between FFG and SunGard would terminate "when FFG stopped using SunGard software as its trust accounting system, but no later than April 30, 1999, without any further action of FFG's part" and that he was not informed prior to April 30, 1999, that SunGard had interpreted the agreement to require written notice of termination. (*Id.* Ex. C ¶ 8.) Davis clarified at his deposition, however, that the only correspondence he was referring to in his affidavit was his own April 8 letter to Gillis, that he couldn't recall whether he and Buckley had a conversation directly regarding the one-year

6

extension, and that neither of the two bases referred to in his affidavit for his understanding of when the agreement would terminate were things SunGard told him. With regard to written notification of termination, Davis testified at his deposition that he believed prior to sending his April 8 letter to Gillis that written notice was required to terminate the agreement and that his letter provided such notice.

On April 28, 1998, the following e-mail exchange took place between Gillis and another SunGard employee, Ann Larson, regarding FFG:

> <u>Gillis</u>: Did you get a termination letter yet from them, if so may I get a copy (I'll make). The letter that was attached to deconversion letter does not refer to termination of contracts. Thanks.
> <u>Larson</u>: Haven't received one yet. I'll tell Joyce to remind them to send one in.

(*Id.* Ex. E.) Ely testified that in April or May, 1998, FFG received a software update from SunGard, that he contacted Buckley to determine whether he needed to update the software, and that Buckley advised him that the software need not be updated because it would be "of no value" since FFG was deconverting off the SunGard system. On October 14, 1998, the following intra-company e-mail exchange occurred between Gillis and another FFG employee, Elizabeth Obitts:

> <u>Gillis</u>: hi what is FFG's (springfield) status for support.
>
> <u>Obitts</u>: They're still on support, have yet to receive a termination letter from them. Their term ends 4/30/99.

From May, 1998, until October, 1998, FFG converted data from the SunGard software system and entered the data into Mercantile's system, and the conversion process was completed

by October 31, 1998.[6] After completion of the deconversion process, Mercantile telephoned SunGard on various occasions, with the last call occurring sometime in January, 1999. While SunGard disputes Mercantile's characterization of these calls as being made to resolve minor issues, the only evidence SunGard proffers to controvert such characterization is Gillis' affidavit testimony that "[i]n November, 1998, after FFG merged with Mercantile, Mercantile personnel contacted SunGard to order new updated software to be used in connection with SunGard's software provided under the Agreement. Ordering such software is not related to the process of deconverting from the SunGard software system." (Mercantile Ex. G ¶ 5.) In addition, Mercantile never entered any data into the SunGard software system after the deconversion process was completed (indeed, Mercantile disabled the input function), but it did access or look at historical data contained on the SunGard software to retrieve historical information. Cook testified at her deposition, however, that it was important for Mercantile to have access to information on the software, although the information was also available on microfiche, but it was a benefit to the operation of her department to have the information available in software form. Cook also testified that she believed Mercantile personnel accessed information from the software until at least July 21, 1999. In addition, Ely testified at his deposition that SunGard software was used after October, 1998 to prepare annual statements and tax worksheets. (Cook also testified that she prepared reports using the software after April 30, 1999.) He further explained that this access "was part of the deconversion package that [FFG/Mercantile] had bought." (Mercantile Ex. D at 102.) However, when asked, "So it wasn't part of the . . .

---

[6] Ely testified at his deposition that not all of the data on the Sungard software was transferred as part of the deconversion process, however, as "[i]t is industry practice that transactional data is not transferred because it is nearly a human impossibility and too major a task." (Mercantile's 56.1 Resp. ¶ 31.)

8

[software subject to the original agreement] that you were using," Ely replied, "Part of it was, but we had to use their programs first. We had to run the programs that we bought as part of the deconversion to create the file to actually generate the statements."[7] Mercantile never prevented SunGard from removing its software from the Mercantile system and paid SunGard all fees that were due under the agreement through April 30, 1999.[8]

On May 17, 1999, Gillis wrote the following e-mail to Buckley regarding FFG and Mercantile:

---

[7]The deposition exchange continues:

Q. Okay. But the information that you were drawing to create these reports was stored on the SunGard system, right?
A. Yes.
Q. Okay. And were you using actual functions and programs to do things with that information that were part of the [originally purchased SunGard] system.
A. Yes.

* * * *

Q. Okay. So it would be incorrect to say that the only use of the SunGard software after October 31, 1998 by Mercantile was limited to viewing historical data?
A. We were viewing it on a print out rather than on a screen.
Q. But you also said, didn't you, and if I'm wrong, tell me, you also said that you were using the software, after October 31, 1998, you were using the report generation function, is that right?
A. But that's just so the customer can view it, can view the transactions on their account.
Q. Okay. So is what you're telling me – and I'm not trying to trick you. I'm trying to understand this. You were just printing out the historical data after October 31, 1998?
A. We were printing it out, yes, sir.
Q. Were you doing anything else with the software?
A. Just printing out the statements and the tax worksheets, and, as I said, there might have been one other. There might have been fees; to print out the historical data, the monetary historical data that was required by law to be provided to customers.
Q. Okay. But isn't it true that you were also using the functions within the software that organized that data and performed calculations and put them is specific report form.
A. Yes.
Q. So it was more than just looking at data. You were using it prepare specific reports, is that right?
A. But if you look at data on the screen, it's formatted. . . . If you look at it on a piece of paper, it's formatted.

[8]SunGard attempts to controvert Mercantile's assertion that it never prevented SunGard from removing its software with Gillis' affidavit testimony. Gillis' testimony only supports the assertion that SunGard could not access its software without Mercantile's permission and needed a password to gain access, not that Mercantile prevented SunGard from gaining such access by refusing to give permission or tendering the password.

9

> As I mentioned to you Clare, Mercantile called me re: invoice for support dated May 7th. Don't know if I am still account manager but am gratefully turning this over to you as it seems you have been through this before and know how to handle. The person at Mercantile that contacted me is Jan Real . . . . Thanks so much for taking this. They never sent a termination letter so it looks like we just got another year of support.

(Mercantile Ex. G.) The parties dispute whether Gillis told Davis during a conversation on May 18 that SunGard had received oral notice of termination of the agreement in April, 1998, but SunGard does not deny that termination was discussed and that Gillis stated that the agreement was not terminated due to the absence of written notice and that it made no difference that FFG had merged with Mercantile and that FFG had ceased inputting data into the SunGard system. Gillis also stated that the only reason SunGard was pursuing Mercantile in this manner was because Mercantile "had done this to them before." (Mercantile Ex. B at 177.)[9] On May 19, 1999, Gillis sent Larson the following intra-company e-mail:

> Ann, This account has finally awakened to the fact that they are still receiving invoices after converting off the system. They called this week and I told them that we've never received a termination latter [sic] for the contract, therefore, we continue to invoice. When I mentioned this to Joe, he recommended that we continue to invoice, but don't recognize any additional revenue until we negotiate with them. Can you do that? Joyce received a call from them also looking to negotiate something so I think they're going down fighting. Let me know what you need, if anything further, to cancel revenue recognition.

(Id. Ex. H.) On May 20, 1999, Larson wrote the following in an e-mail to Sheldon Johnson, an employee of SunGard's subcontractor responsible for maintaining computer hardware under the agreement entered into between the parties, Digital Equipment Corporation, "Please cancel the

---

[9]Davis testified to this statement at his deposition. Although SunGard only admits, without any elaboration, that "Gillis indicated that Mercantile had previously engaged in conduct similar to the conduct at issue in this case with respect to Sungard's computer software," SunGard 56.1 Resp. ¶ 38, it fails to cite to any supporting evidence and, therefore, fails to controvert Davis' deposition testimony.

[FFG] agreement 30 days from today (sooner if possible). The customer was purchased by Mercantile Bank and off the system since December 1998. We continued to bill them because we received no formal termination on the contract." (Mercantile's Summ. J. Mot. Supplement.)

Davis wrote the following in a letter to Gillis on June 18, 1999:

> I wanted to send this note as confirmation of my previous correspondence with you and other employees of your company that Mercantile . . ., the successor in interest to FFG . . ., has terminated its agreements with Sunguard [sic] . . ., the successor in interest to [NCS] AS OF April 30, 1999. The Software License Agreement, Purchase Agreement, and Maintenance Agreement originally between [NCS] and First national Bank of Springfield expired on April 30, 1998, but were renewed for a one-year period expiring April 30, 1999.

(Mercantile Ex. C Ex. D (emphasis in the original).) Gillis responded on August 17, 1999 by writing Davis that SunGard had received his April 8, 1998 letter stating that FFG planned to deconvert sometime in 1998 and requesting deconversion cost information and that based on that correspondence, SunGard had anticipated receiving a written notice of termination. Because SunGard never received such notice and based on paragraph four of the agreement's addendum, the letter continued, the agreement was automatically renewed for an additional one-year period effective May 1, 1999. The letter then stated that based on the automatic renewal, SunGard continued to invoice FFG/Mercantile, that the unpaid invoices currently totaled $53,927.96, and that in light of the fact that Mercantile is no longer using the software, SunGard would now accept a 90 day cancellation notice, rather than the 120 days required by the addendum. Gillis also stated what appears to be her proposal for settling what she considered the outstanding balance. She stated, "In return for permitting Mercantile early termination of the Agreement, Mercantile agrees to pay the above outstanding invoices, as well as the amount of forty thousand, four hundred forty-five dollars and ninety-seven cents ($40,445.97), which covers the invoicing

11

associated with the period of notification." The letter closed with Gillis asking Davis to forward termination notice and payment of the listed invoices prior to August 31, 1999, which she stated was the expiration date of her proposal.

The SunGard software is no longer contained on Mercantile's computer system, and Mercantile does not possess any kind of medium that contains the software. Moreover, the software was never copied, transferred, disclosed or provided to any third party by FFG/Mercantile, although the parties dispute whether FFG/Mercantile had any physical, tangible copies of the SunGard software to return to SunGard. Mercantile claims that the software is intangible and SunGard argues that because the software could be copied from a computer's hard drive onto a diskette and returned in this manner to SunGard, the software is a tangible object. Mercantile, however, fails to present any evidence to controvert Davis' affidavit testimony that SunGard never requested that FFG/Mercantile create a physical form of the SunGard software or certify in writing that it had been destroyed.[10] In addition, apparently some equipment was specifically used to access the SunGard system and Ely dismantled this equipment by disconnecting phone lines and collecting terminals sometime in the year 2000 upon a request from Cook. In March 2000, Mercantile contacted SunGard and indicated that SunGard could access Mercantile's system to remove the software.

## DISCUSSION

The agreement and addendum provide that Minnesota law governs the disputes at issue here. *See Freund* v. *E.D. & F. Man Int'l, Inc.*, 199 F.3d 382, 383 (7th Cir. 1999) ("The contract

---

[10]Buckley's April 22, 1998 letter submitted in support of SunGard's denial of this statement only shows that Buckley requested return or destruction of the deconversion software.

provides that it shall be interpreted in accordance with Illinois law and the parties agree, at least tacitly (and that's good enough), that Illinois law governs the enforceability as well as interpretation of the contract."); *GNB Battery Tech., Inc. v. Gould, Inc.*, 65 F.3d 615, 622 (7th Cir. 1995) (applying Illinois law after noting that "[b]oth parties agree, and the contracts provide, that Illinois law governs the interpretation of the documents").[11] Under Minnesota law, "[t]he cardinal purpose of construing a contract is to give effect to the intention of the parties as expressed in the language they used in drafting the whole contract." *Art Goebel, Inc. v. North Suburban Agencies, Inc.*, 567 N.W.2d 511, 515 (Minn. 1997). Moreover, the court must give contract language "its plain and ordinary meaning" and "read its terms in the context of the entire contract." *Bureau of Collection Recovery, Inc. v. Eden West Partners L.L.C.*, No. C6-00-2003, 2001 WL 799871, at *1 (Minn. Ct. App. July 17, 2001) (citing *Turner v. Alpha Phi Sorority House*, 276 N.W.2d 63, 67 (Minn. 1979) and *Kaufman Stewart v. Weinbrenner Show Co.*, 589 N.W.2d 499, 502 (Minn. Ct. App. 1999)).

The agreement provides that the parties may amend the agreement if done in writing. The parties did so by entering into an addendum to the agreement on the same day they signed the agreement. In addition, the parties agreed that if any language contained in the addendum was "at variance" with language contained in the agreement, the addendum would control. It is clear that when read as a whole, the agreement and its addendum evidence the parties' intent that their contracting relationship would exist indefinitely so long as neither terminated the contract. The schedules to the agreement provide that the term of the agreement was "perpetual" and both the

---

[11] Even though Mercantile cited Illinois law in its opening summary judgment brief, it cited only Minnesota law in its reply brief after Sungard noted the contract's Minnesota choice-of-law provision in its response.

13

agreement and the addendum provide for automatic one year renewal. The court, therefore, rejects Mercantile's arguments that the agreement automatically terminated on April 30, 1998, and that the parties entered into an oral agreement to continue their relationship for only one more year without any automatic contract renewal based on the addendum's paragraph nine. Paragraph nine only obligated NCS (and subsequently SunGard) to provide support for no less than five years after the agreement's acceptance date and did not affect the parties' intention that the contract could continue indefinitely until terminated.[12]

In addition, neither the agreement nor the addendum required return of the software in order to terminate the agreement, as argued by SunGard. Paragraph eight of the agreement twice states that termination and return of the software are separate issues. First, the agreement states that if FFG discontinued use of the software, the software license automatically terminated and all software must then be returned to SunGard.[13] Second, the paragraph states that "[u]pon termination for any reason by either party, and within ten (10) days of such termination, all copies of the Software . . . shall be returned to NCS." (Mercantile Mem. in Supp. Ex. A ¶ 8.) Neither of these provisions can be sensibly read as making termination contingent upon return of the software.

As the contract clearly provides that it would not expire without notice of termination by

---

[12]The court also rejects Mercantile's argument that the agreement automatically terminated upon FFG/Mercantile's completion of the deconversion process based on paragraph eight, which provides for automatic termination of the software license and requires immediate return of the software "upon discontinuance of the use of the licensed Software by Customer," because, first, this provision only terminates the license granted but does not relieve Mercantile of all liability under the contract, and, second, there is a material fact dispute as to whether FFG/Mercantile discontinued its use of the software after deconversion.

[13]The language reads: "upon discontinuance of the use of the licensed Software by Customer, the license granted by this Agreement shall terminate automatically and all Software and all copies thereof shall be immediately returned to NCS at Customer's sole cost and expense . . . ." (Mercantile Mem. in Supp. Ex. A ¶ 8.)

14

either party, and as it did not require return of any software to effect termination, the determinative inquiry is whether FFG/Mercantile provided SunGard with notice of termination so that the contract finally expired on April 30, 1999. Because the addendum controls when any of its terms varied from terms contained in the agreement, the court finds that written notice of termination was not required. According to the addendum, "notice," as opposed to "written notice," was all that was required. Hence, oral notice, so long as provided 120 days before the expiration of the current term, would suffice. A material fact issue exists, however, as to whether such notice was provided. Among other fact disputes, Ely attested that he specifically informed Buckley that the agreement would terminate in April, 1999, and Buckley attested that Ely did not issue such notice. Moreover, even if this court agreed with SunGard's argument that continued use of the software nullified any notice of termination, a material factual issue likewise exists as to whether FFG/Mercantile "used" the software when it retrieved historical data and compiled reports.[14]

For these reasons, summary judgment on count I is not warranted in either party's favor. Although Mercantile claims that it moves for summary judgment on all counts of the complaint, its moving papers only address count I. However, "[a] litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point." *Pelfresne v. Village of Williams Bay*, 917 F.2d 1017, 1023 (7th Cir. 1990). Not only has Mercantile failed to cite pertinent authority to support summary judgment on those counts, it fails to make any mention of the legal

---

[14] On this point, it is worthy to note that SunGard itself may not have viewed FFG/Mercantile as using the software after the deconversion since it informed its subcontractor, Digital, that Mercantile was "off the system" and because it also believed that updating the system would be of no value after the deconversion.

issues contained in the remaining three counts, namely, quantum meruit, conversion, and the Illinois Trade Secrets Act. Mercantile, therefore, has utterly failed to convince the court that it is entitled to summary judgment on those counts.

## CONCLUSION

For the above-stated reasons, the court denies both Mercantile's motion for summary judgment [#18] and Sungard's motion for summary judgment on count I [#32]. This matter is set for status on October 22, 2001, at 9:30 a.m.

Date: September 28, 2001         Enter: _____
                                 JOAN HUMPHREY LEFKOW
                                 United States District Judge